UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION


PAUL CHAMBLEE                                        PLAINTIFF

VS.                              CIVIL ACTION NO. 3:11CV655TSL-JMR

MISSISSIPPI FARM BUREAU FEDERATION;
RANDY KNIGHT AND DAVID WAIDE                        DEFENDANTS


MEMORANDUM OPINION AND ORDER

This cause is before the court on the motion of defendants
Mississippi Farm Bureau Federation, Randy Knight and David Waide
for summary judgment pursuant to Rule 56 of the Federal Rules of
Civil Procedure.  Plaintiff Paul Chamblee has responded in
opposition to the motion and the court, having considered the
memoranda of authorities, together with attachments, submitted by
the parties, concludes that defendants' motion is well taken and
should be granted.

Plaintiff Paul Chamblee was terminated from his employment
with Mississippi Farm Bureau Federation (Farm Bureau or MFBF) in
January 2011.  Following his termination, Chamblee filed the
present action alleging he was terminated on account of his age in
violation of the Age Discrimination in Employment Act, 29 U.S.C.
621, *et seq.* (ADEA).  He also asserted state law claims for
negligent and intentional infliction of emotional distress,
invasion of privacy, defamation, breach of contract, wrongful

termination and civil conspiracy.  Defendants have moved for
summary judgment on all of Chamblee's claims.

     The following undisputed facts are gleaned from the record
evidence.  Defendant Farm Bureau is a private organization of farm
families which represents the interests of Mississippi farm
families.  Farm Bureau is organized on a county, state and
national level, with the county being the nucleus of the
organization.  There is a county farm bureau in each of
Mississippi's eighty-two counties, which represent a combined
nearly 200,000 members.  At the state level, Farm Bureau has four
officers, a president and three vice-presidents, who are elected
every other year.  In addition, the organization employs eight
regional managers and various staff, all of whom are at-will
employees.  Plaintiff Paul Chamblee was employed as a regional
manager from January 1995 until his January 2011 termination.
Chamblee was 55 years old.  Another regional manager, Greg Shows,
age 40, was terminated at the same time.  According to Farm
Bureau, age played no role in either termination; rather, both
were terminated because of their involvement in Farm Bureau
politics.   Farm Bureau explains that in early 2010, defendant
David Waide, who had served as president of Farm Bureau for the
previous fourteen years, announced he would not run for
reelection.  Randy Knight, then a vice president, immediately
announced his intent to run for president.  He was opposed by two

2

candidates, Ken Middleton and Brad Bean.  While the candidates campaigned throughout the year, their campaigns switched into high gear in the fall, in advance of the December 2010 election. Ultimately, Knight won the election, and upon assuming office in January 2011, he fired Chamblee and Greg Shows, ostensibly because they had assisted in Ken Middleton's election campaign.

It is undisputed that during Waide's presidency, it was Farm Bureau policy that Farm Bureau employees were prohibited from participating in the politics of elections.  This was a particularly important rule for regional managers, who were tasked with educating county farm bureaus within their respective regions and were in the field regularly meeting with county bureau officials and members on the president's behalf.  Given their role as the president's "eyes and ears" in the field, it is imperative that the president be able to trust his regional managers.  Thus, while all might go well for a regional manager who supported the winning candidate in an election, one who campaigned for a losing candidate (and hence against the winner) was at risk of losing his job if the newly-elected president believed he did not have the regional manager's support during the election.  For this reason, all Farm Bureau employees, including Chamblee, were explicitly warned by Waide that they could lose their jobs if they became involved in the campaign for president.

3

Chamblee admits he knew his job would be in jeopardy if he were to become involved in the political process of the election campaign, and he insists that he stayed out of the campaign.  But according to Farm Bureau, there was ample evidence which led Knight to conclude that Chamblee and Shows had supported Middleton in his election campaign.  Accordingly, upon taking office as Farm Bureau president, Knight informed both men that because of their involvement in the political process of the election, they could resign or be terminated; both resigned.  After filing an EEOC charge alleging he was discharged because of his age and receiving his notice of right to sue, Chamblee brought the present action.

The ADEA makes it "unlawful for an employer to fail or refuse to hire ... any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C. § 623(a)(1).[1]  To establish an ADEA claim, "[a] plaintiff

---

[1]     Plaintiff cannot state a claim for individual liability against either Waide or Knight under the ADEA.  See Medina v. Ramsey Steel Co., Inc., 238 F.3d 674, 686 (5th Cir. 2001) ("[T]he ADEA 'provides no basis for individual liability for supervisory employees.'") (quoting Stults v. Conoco, Inc., 76 F.3d 651, 655 (5th Cir. 1996)).  The court notes that plaintiff has purported to assert a state law claim against Waide and Knight for conspiracy to violate his right to be free from age discrimination.  In the court's opinion, as a matter of law, such a claim is not actionable.  Cf. Windham v. Cardinal Health, Inc., No. CIVA504CV262-DCBJCS, 2006 WL 51185, 7 (S.D. Miss. Jan. 9, 2006) (dismissing claim under federal conspiracy statute for alleged conspiracy to violate ADEA, reasoning that ADEA's comprehensive remedial framework should not be circumvented by resorting to the

4

must prove by a preponderance of the evidence (which may be direct or circumstantial), that age was the 'but-for' cause of the challenged employer decision." Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 173-78, 129 S. Ct. 2343, 2351, 174 L. Ed. 2d 119 (2009). Where a plaintiff lacks direct evidence of age discrimination, his claim is analyzed under the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). See Jackson v. Cal-Western Packaging Corp., 602 F.3d 374, 378 (5th Cir. 2010) (applying McDonnell Douglas framework to ADEA claim). Under this framework, "'[a] plaintiff relying on circumstantial evidence must put forth a *prima facie* case, at which point the burden shifts to the employer to provide a legitimate, non-discriminatory reason for the employment decision.'" Moss v. BMC Software, Inc., 610 F.3d 917, 922 (5th Cir. 2010) (quoting Berquist v. Washington Mut. Bank, 500 F.3d 344, 349 (5th Cir. 2007)). "If the employer articulates a legitimate, non-discriminatory reason for the employment decision, the plaintiff must then be afforded an opportunity to rebut the employer's purported explanation, to show that the reason given is merely pretextual." Id. (citing Jackson, 602 F.3d at 378-79). A plaintiff may establish pretext directly,

---

broader and less procedurally complicated conspiracy statute) (citing Great Am. Fed. Sav. & Loan Ass'n v. Novotny, 442 U.S. 366, 378, 99 S. Ct. 2345, 60 L. Ed. 2d 957 (1979)). In any event, there is no proof to support plaintiff's conspiracy allegations.

by showing that a discriminatory motive more likely motivated his employer's decision, such as through evidence of disparate treatment, or indirectly, by showing that the employer's proffered explanation is unworthy of credence.  Wallace v. Methodist Hosp. System, 271 F.3d 212, 220 (5th Cir. 2001) (citation omitted).  It is insufficient under the ADEA to show that discrimination was a motivating factor; the plaintiff instead must show that age was the "but for" cause of the challenged adverse employment action.  Moss, 610 F.3d at 928 (citing Gross, 557 U.S. at 173-78, 129 S. Ct. at 2351, 174 L. Ed. 2d 119).

To make a *prima facie* case of age discrimination, Chamblee must establish the following four elements: (1) he was discharged; (2) he was qualified for the position; (3) he was within the protected class at the time of discharge, and (4) he was either (I) replaced by someone outside the protected class, (ii) replaced by someone younger, or (iii) otherwise discharged because of his age.  Jackson, 602 F.3d at 379.  Farm Bureau does not dispute that Chamblee's proof establishes a *prima facie* case of age discrimination.  Plaintiff was a member of the protected class of employees age 40 or older; he was qualified for his position; he was discharged; and following his termination, his job duties were assigned to an individual or individuals outside the protected

6

class.[2]  Moreover, defendants have proffered a legitimate, nondiscriminatory reason for plaintiff's termination.  The issue, therefore, is whether plaintiff has presented sufficient evidence to create an issue for trial on his claim that Farm Bureau's asserted reason for his termination is pretext for age discrimination.

Chamblee attempts to establish pretext by showing Farm Bureau's justification for his termination was false or unworthy of credence.  "In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147, 120 S. Ct. 2097, 2109, 147 L. Ed. 2d 105 (2000).  In the court's opinion, Chamblee has failed to create a genuine dispute of material fact concerning Farm Bureau's reason for his termination.

Primarily, Chamblee has undertaken to establish falsity of Farm Bureau's proffered reason by proving that he was not, in fact, involved in any manner in the political process of the election.  But even if that is true, the Fifth Circuit has repeatedly emphasized that "a fired employee's actual innocence of

---

[2]      While Chamblee claims his territory was assigned to 23-year old Matthew Bales, Farm Bureau has submitted evidence that following a restructuring of the regions shortly after Chamblee's termination, three different regional managers, all under the age of 40, ended up with a portion of Chamblee's former territory. The majority of Chamblee's prior territory was assigned to John Kilgore, who was 38.

his employer's proffered accusation is irrelevant as long as the employer reasonably believed it and acted on it in good faith." Cervantez v. KMGP Servs. Co. Inc., 349 Fed. Appx. 4, 10, 2009 WL 2957297, 4 (5th Cir. 2009) (citing Waggoner v. City of Garland, 987 F.2d 1160, 1165 (5th Cir. 1993)); see also Mayberry v. Vought Aircraft Co., 55 F.3d 1086, 1091 (5th Cir.1995) ("The question is not whether an employer made an erroneous decision; it is whether the decision was made with discriminatory motive."). Thus, Chamblee's "assertion of innocence alone does not create a factual issue as to the falsity of [the employer's] proffered reason for terminating him." Jackson, 602 F.3d at 379. The issue is whether Farm Bureau reasonably believed Chamblee was involved in the campaign and acted based on that belief; and in the court's opinion, on this issue, Chamblee has failed to come forward with sufficient evidence to create a genuine dispute of fact warranting a trial.

Uncontroverted evidence has been presented tending to show that Ken Middleton had the benefit of "inside information" during his 2010 election campaign. According to a number of witnesses, it was apparent during the campaign that Middleton was privy to inside information; and some, including Randy Knight, believed that he had gotten the information from Chamblee and/or Shows. In his deposition, David Waide related that around August or September 2010, both Knight and Brad Bean complained to him that

8

someone on the Farm Bureau staff was leaking information to Middleton.  Waide said he knew this was true since he had heard Middleton give campaign speeches at county board meetings in which Middleton "would repeat things in his speech that, unless somebody on the inside was feeding him information, he would not have known."  Waide testified that from the nature of the information to which Middleton obviously had been made privy, it was apparent the information could have come from one of only ten people, including the eight regional managers.  In an effort to identify the source of the leak, Waide obtained cell phone records of these ten individuals covering about two months.  Waide stated that after examining the records, two regional managers, Chamblee and Shows, "stood out" as having an excessive number of calls and texts to Middleton.

Doug Ervin, another regional manager, also testified that he heard during the election campaign of 2010 that someone in Farm Bureau management was leaking information to Middleton.  And while he stated that no one told him the source of the leak, which he estimated could have been one of about twenty people, he "had [his] thoughts" about it, which were that the leak was Chamblee or Shows.  This was his "gut feeling" based on his perception of their interaction during the campaign.

Similar to Ervin, Regional Manager Samantha Webb testified that during the campaign, she perceived that there was "a much

9

closer and friendly relationship" between Chamblee and Middleton
"than [she] ever saw any of the other regional managers or staff
members exhibit with any candidate," which she found "alarming."
She further related a telephone call she received from Middleton
in the fall of 2010 in which he asked her to help set up a meeting
with a county president or two.  She declined since she was not
comfortable being involved in politics.  Webb stated that when she
told Middleton she would not help him, he replied, "It's not that
big of a deal.  Other [regional managers] are doing it.  Some of
the others are helping in doing things like that."  Webb testified
that she reported this conversation to Waide, including the fact
that Middleton had told her he had other regional managers working
for him.  Waide's response, she stated, was along the lines of "I
bet I know who those might be," or "those wouldn't be hard to
guess."

Ervin also testified that Ken Middleton had called him during
the campaign and asked him to be on Middleton's team and told him
that things would be easier for him if he were.  This made him
think that Middleton had likely called other regional managers and
said the same thing to them.  Although Ervin did not report this
conversation to Waide, Waide indicated in his deposition testimony
that he was aware of the conversation, perhaps because he had
overheard Ervin tell Webb about the call.

In his deposition, Randy Knight related that during the 2008 campaign in which Ken Middleton ran against then-incumbent Waide, he saw that Chamblee and Shows were involved in trying to help Middleton beat Waide.  He explained that he had observed the three men talking together every time they had the opportunity; and he stated that while he was not privy to their conversations, it was obvious to him what was going on.  He testified that during the 2010 election in which he was running against Middleton, there was widespread talk that there were people on the inside who were involved in election politics.  He also became aware that there was a mole, or more than one mole, on the staff feeding information to Middleton since Middleton was saying things on the campaign trail that only people on the inside would have known; Knight reported this to Waide.

Knight acknowledged that during the 2010 election, no one ever told him that Chamblee was involved in the election campaign or presented him with any documentation indicating that Chamblee was involved in the campaign.  However, Knight stated that during the 2010 campaign, he felt strongly from what he witnessed of their interaction that Chamblee was working together with Middleton, supporting him and doing all he could to help Middleton win the election.  Knight testified, "I saw what I believed in my mind that he was doing everything he could to help Mr. Middleton."  Knight related that the day after the election, when Waide came by

11

the office to pick up some things, the two discussed Knight's expressed concern that some regional managers may have been involved in the election campaign.  Knight testified that he asked whether Waide had any evidence of Chamblee's and Shows' involvement, and Waide offered him the phone records that he had previously reviewed.  According to Knight, Waide volunteered that prior to the election, he "felt like" Shows and Chamblee were involved in the political process.[3]

Knight testified that two days later, he met with and informed William E. Davis, treasurer and chief financial officer of Farm Bureau, that he wanted to terminate Chamblee and Shows for violating the policy against involvement in Farm Bureau politics. Davis responded that he would need documentation to support the decision so he gave the cell phone records he had gotten from Waide to Farm Bureau's attorney, Sam Scott, and asked Scott to conduct an investigation.  According to Knight, he told Scott that he "wanted him to do some further investigation to see if we had some material evidence that we could produce to go along with what I had seen and what I knew had been happening."  After Scott completed his investigation, which purportedly included review of

---

[3]      In his testimony, Waide confirmed that based on the phone records, he suspected Chamblee and Shows of helping in Middleton's campaign.  In his deposition, Waide could not recall whether he shared this information with Knight when they met on December 4, 2010 and could not deny that he identified Chamblee and Shows to Knight as likely culprits.

updated cell phone records showing extensive contact between
Chamblee and Shows and candidate Middleton – 63 calls between
Chamblee and Middleton and 211 between Shows and Middleton in the
three months preceding the election – Knight concluded he had
sufficient evidence to confirm Chamblee's and Shows' involvement
in Middleton's campaign and was warranted in asking for their
resignations.

In response to defendants' motion, plaintiff points out that
Knight admittedly had no "piece of paper, note, memo, text
message, [or] e-mail" establishing that Chamblee supported
Middleton for president, and he insists that the falsity of Farm
Bureau's purported reason for his termination is demonstrated by
the lack of hard evidence documenting that he had supported or
helped Middleton.  Again, however, the issue is not whether
Chamblee was actually innocent of the accusation that he supported
Middleton but rather is whether Farm Bureau reasonably believed
the accusation and acted on it in good faith.  See Cervantez, 349
Fed. Appx. at 10, 2009 WL 2957297, at 4.  That said, the court
might conclude that an issue of fact as to pretext were presented
if plaintiff had demonstrated that Knight made the termination
decision without any evidence to suggest that Chamblee was
involved in Middleton's election campaign.  But the court finds no
merit in plaintiff's implicit suggestion that pretext can
reasonably be found based solely on Knight's having decided to

terminate his employment in the absence of *conclusive* proof that plaintiff supported Middleton's campaign.

Plaintiff argues that the only actual evidence defendants had at the time of his termination was cell phone records, which he insists was proof of nothing. He contends that while Farm Bureau purports to have determined based on these records that he had excessive contact with Middleton during the election campaign, its putative conclusion that the number of calls and text messages indicated that he was involved in Middleton's campaign was nothing more than speculation and conjecture. He further points out that Knight, who made the termination decision, admitted he never even personally reviewed the cell phone and text records, and he argues that the records, or at least those that have been produced during discovery and hence are properly before the court, do not support Farm Bureau's claim of 63 calls or text messages between Chamblee and Middleton in the months preceding the election. Plaintiff, though, does not deny that he had over 50 calls and texts with Middleton during the 2010 campaign.[4] And while he discounts the

---

[4] Defendants deny plaintiff's claim that they have failed to produce the cell phone records reviewed by Waide and the additional records reviewed by Sam Scott prior to Chamblee's termination. They maintain that they have produced all plaintiff's and Shows' cell phone records for the year 2010, as well as the cell phone records of the other regional managers and management officials for the period of August 1, 2010 to November 15, 2010. Defendants correctly submit that if plaintiff believed they were withholding records to which he was entitled, then he could and should have moved to compel production of these records during discovery and has no basis for objection at this point.

significance of this number, contending that some other regional managers had even more calls and texts with Middleton, Waide's testimony that he viewed Chamblee's calls and texts with Middleton as excessive is uncontroverted.

Moreover, Knight testified that while he considered the cell phone records, his decision to terminate was based primarily on his own personal observations during the election campaign of the interaction between the candidate Middleton and Regional Managers Chamblee and Shows.  Knight stated:

> The biggest part of the decision was made from what I saw from being out there for eight months running all over this state going from county to county, and what I saw with my two eyes that those three guys were doing. That was the biggest thing that influenced my decision. ...
> I felt like I did what I had to do to try for me to make the best decisions and a run this organization the best I knew how, but I had to have folks that worked for me that I could trust, that I didn't have to worry about stabbing me in the back, and I knew in my heart and in my gut that both of those guys would stab me in the back, and that's how I made my decision.

In fact, although Knight seems to intimate in his declaration that he made the termination decision in consultation with Sam Scott, who had reviewed Chamblee's cell phone records, it is clear from the deposition testimony that Knight had already expressed his desire and intent to terminate Shows and Chamblee prior to

consulting with Scott.[5]  Knight testified plainly that he knew

before Scott reviewed Chamblee's and Shows' cell phone records

that they had supported Middleton in the election campaign, and

Knight made clear that he would have made the decision to

terminate them with or without the cell phone records.  He

indicated that he requested Scott to conduct an investigation in

an effort to obtain proof to corroborate their involvement and

thereby head off any potential legal challenge.  According to

Knight, Scott's report that the phone records showed 63 calls

between Chamblee and Middleton and 211 between Shows and Middleton

merely served to "confirm[] what [he] knew to be true–both Greg

Shows and Paul Chamblee were involved in the campaign and heavily

supporting Middleton."[6]  Even assuming Chamblee was involved in

---

[5]      In response to what he interprets from Knight's
declaration as an attempt to place responsibility for the
challenged employment decision on Scott, plaintiff submits that
defendants, having invoked the attorney-client privilege in
refusing to answer deposition questions about Knight's discussions
with Sam Scott, should not be permitted to assert a defense based
on "advice of counsel."  Alternatively, he requests that the court
reopen discovery to allow him an opportunity to depose Scott.
However, the court does not perceive defendants to be contending
that Chamblee was terminated on advice of counsel.  His request
for discovery will be denied.

[6]      Plaintiff has moved to strike Knight's declaration on
the bases that it directly contradicts his deposition testimony
and contains inadmissible hearsay.  In the court's opinion, it is
clear that summary judgment is in order, with or without Knight's
declaration.  However, the court is also of the opinion that
plaintiff has not demonstrated a basis for striking Knight's
declaration.
     Although plaintiff broadly criticizes the declaration as
inconsistent with Knight's deposition testimony, plaintiff has not

16

Middleton's campaign, he has not presented sufficient evidence to create an issue for trial on Knight's belief of his involvement in the campaign.

Plaintiff alternatively has attempted to show pretext with proof of disparate treatment.  In particular, he contends that it is suggestive of pretext that Knight did not investigate other regional managers for possible involvement in the 2010 election campaign and instead investigated only Chamblee and Shows, both of whom were in the protected age group.  In other words, he seems to claim that other regional managers were treated more favorably

---

identified any specific respect by which he contends it is inconsistent, and no inconsistency is apparent to the court. Knight arguably suggests in his deposition that he and Scott together made the termination decision, stating that "after consulting with Sam Scott, ... we agreed that their employment with Farm Bureau must come to an end."  In the court's view, this is not inconsistent with his deposition testimony regarding the process by which he came to the final decision to terminate.  In substance, according to Knight, Scott agreed with his decision to terminate.

Most of the statements to which plaintiff objects as hearsay relate to Knight's professed belief, based on his own observations, that Chamblee and Shows were involved in and supported Middleton's campaign.  These statements are not hearsay. Contrary to plaintiff's urging, Scott's report to Knight of the number of calls and texts is not hearsay as it is not offered to prove the truth of the matter asserted but rather to prove only that Knight was informed by Scott that cell phone records showed 63 phone calls and texts between Chamblee and Middleton and 211 calls and texts between Shows and Middleton.

As to other statements purporting to relate Scott's conclusion as to the sufficiency of the evidence to support Chamblee's and Shows' terminations or Scott's opinion that they should be terminated, plaintiff's hearsay objection may have merit.  However, those statements have no bearing on the court's decision herein.

because they were not even investigated for possible misconduct. For disparate treatment, "the misconduct for which the plaintiff was discharged [must be] nearly identical to that engaged in by other employees". Okoye v. Univ. of Tex. Hous. Health Sci. Ctr., 245 F.3d 507, 514 (5th Cir. 2001) (quotations omitted).  In the court's opinion, plaintiff has failed to demonstrate that he and Shows were similarly situated to other regional managers, who had not engaged in conduct which caused Knight to suspect them of improper involvement in the political process.  Simply put, Farm Bureau had no reason to investigate all regional managers when only two were suspected of violating the rule against involvement in Farm Bureau politics.  The fact that the investigation was limited to the individuals suspected of campaigning does not show pretext.[7]  Therefore, as plaintiff has failed to create a genuine

---

[7]     The court would observe, too, that while Shows is not a plaintiff, Chamblee has noted that both he and Shows were within the ADEA-protected age group, and he has posited that Farm Bureau's decision to terminate both of them ostensibly for supporting Middleton was pretext for age discrimination.  However, Shows, at age 40, was only barely within the protected class; and Don Kilgore, the individual who can most fairly be said to have replaced Chamblee, was only two years younger than Shows.  On the other hand, Knight, who made the decision to fire them, was 50 years old and hence well within the protected class.  See Brown v. CSC Logic, Inc., 82 F.3d 651, 658 (5th Cir. 1996) (fact that decision maker is also a member of a protected class creates inference that decision maker did not make the adverse decision because of the plaintiff's protected class).

issue of material fact on pretext, his ADEA claim will be dismissed.[8]

In addition to his ADEA claim, plaintiff has asserted a number of state law claims, including for intentional and/or negligent infliction of emotional distress, invasion of privacy, defamation, breach of contract and wrongful discharge. For the reasons that follow, the court concludes that defendants are entitled to summary judgment on each of these claims.

---

[8]     The court notes that in response to defendants' motion, plaintiff has presented argument in support of a putative claim of disparate impact, contending, in particular, that he was the victim of a restructuring plan by Farm Bureau designed to "youth-size" the organization which resulted in a reduction in the average age of its regional managers by 13 years. However, among other shortcomings identified in their reply brief in support of dismissal of such claim, defendants note that plaintiff did not present this claim to his EEOC charge and it is therefore not properly before the court. See Pacheco v. Mineta, 448 F.3d 783, 791-92 (5th Cir. 2006) (holding that employee failed to exhaust disparate-impact claim where EEOC charge alleged only disparate treatment and identified no neutral employment policy). Indeed, plaintiff's EEOC charge can only reasonably be interpreted as asserting a disparate treatment claim, not a disparate impact claim. The court notes, moreover, that plaintiff has not alleged a viable disparate impact claim in any event. Although he does allege that regional managers in the protected class were adversely impacted by the restructuring, he has identified no facially neutral policy that resulted in this alleged disproportionately adverse effect. See Hebert v. Monsanto, 682 F.2d 1111, 1116 (5th Cir. 1982) (explaining that disparate-impact discrimination addresses employment practices or policies that are facially neutral in their treatment of protected groups but have a disproportionately adverse effect on such a protected group). On the contrary, he claims that the restructuring was intentionally discriminatory, characterizing the restructuring as "a masterful plan to change the workforce and disguise violations of the ADEA" which adversely impacted employees within the protected age group, including him.

To prevail on a claim for intentional infliction of emotional distress, the challenged conduct must be so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency. <u>Starks v. City of Fayette</u>, 911 So. 2d 1030, 1036 (Miss. Ct. App. 2005) (citing <u>Diamondhead Country Club and Property Owners Ass'n., Inc. v. Montjoy</u>, 820 So.2d 676, 684 (Miss. Ct. App. 2000)). In <u>Starks</u>, the court observed that "[a] claim for intentional infliction of emotional distress will not ordinarily lie for mere employment disputes[,] <u>id</u>. (citing <u>Lee v. Golden Triangle Planning & Dev. Dist., Inc.</u>, 797 So. 2d 845, 850 (Miss. 2001)); "'[r]ecognition of a cause of action for intentional infliction of emotional distress in a workplace environment has usually been limited to cases involving a pattern of deliberate, repeated harassment over a period of time.'" <u>Id</u>. (quoting <u>Lee</u>, 797 So. 2d at 750). <u>See also</u> <u>Prunty v. Arkansas Freightways, Inc.</u>, 16 F.3d 649, 654 (5th Cir. 1994) ("Only in the most unusual cases does the conduct move out of the 'realm of an ordinary employment dispute' into the classification of 'extreme and outrageous,' as required for the tort of intentional infliction of emotional distress.")(citations omitted). Here, plaintiff declares in response that "this case is not your ordinary employment dispute," yet he has pointed to no evidence in the record that raises a genuine issue as to whether defendants ever engaged in such egregious behavior. His claim therefore

fails as a matter of law.  See Brown v. Inter-City Federal Bank for Sav., 738 So. 2d 262, 265 (Miss. Ct. App. 1999) (stating that "[m]ore is required to support an intentional infliction of emotional distress recovery than the usual age discrimination claim[,]" and finding proof that employer disparaged employee as too old, asked her when she would retire, removed her from the main office, said she needed a man's help, and ultimately fired her did not create cognizable claim).

Defendants correctly point out that any claim by plaintiff for negligent infliction of emotional distress relating to his termination is plainly barred by the exclusivity provision of the Mississippi Worker's Compensation Act (MWCA), Miss. Code Ann. § 71-3-9.  See Easterling v. AT & T Mobility, LLC, 824 F. Supp. 2d 729, 733 (S.D. Miss. 2011) (finding that claim for negligent infliction of emotional distress based on employee's termination was barred by the Mississippi Workers' Compensation exclusivity bar); Berry v. Advance America, Civil Action No. 3:06CV348TSL-JCS, 2007 WL 951590, *3 (S.D. Miss. Mar. 27, 2007) (holding state law claim for negligent infliction of emotional distress based on defendant's having terminated plaintiff and having allegedly provided adverse references to potential employers barred by the exclusivity provision of the Mississippi Workers' Compensation Act).  Plaintiff does not dispute this but argues that the MWCA is no bar to his claim for negligent infliction of emotional distress

21

based on defendants' conduct *after* his termination which caused
him to suffer reasonably foreseeable emotional distress.   However,
defendants have sought summary judgment as to any such claim on
the basis that plaintiff has failed to allege or present proof of
damages as would support a claim for negligent infliction of
emotional distress.   The Mississippi Supreme Court has held that
"where the defendant's conduct rises only to the level of ordinary
negligence, the plaintiff must prove some sort of injury or
demonstrable harm, whether it be physical or mental, and that harm
must have been reasonably foreseeable to the defendant." Wilson
v. General Motors Acceptance Corp., 883 So. 2d 56, 64 (Miss.
2004).   Plaintiff's vague assertion in his affidavit submitted in
response to defendants' motion that he has "ha[s] been depressed,"
and has "suffer[ed] many sleepless nights, and other symptoms of
emotional distress," is insufficient to maintain a claim under
Mississippi law for negligent infliction of emotional distress.
See id. (finding no claim where alleged emotional distress
consisted primarily of loss of sleep and the plaintiff neither
sought nor received any medical treatment or professional
counseling regarding her alleged emotional distress); Adams v.
U.S. Homecrafters, Inc., 744 So. 2d 736, 744 (Miss. 1999) (finding
that "Adams's vague testimony about loss of sleep and worry ...
was insufficient to support an instruction or an award of damages
for emotional distress"); Morrison v. Means, 680 So. 2d 803, 806

22

(Miss. 1996) (finding that the plaintiff's testimony as to the loss of sleep was not enough evidence to support verdict for emotional distress damages); Strickland v. Rossini, 589 So. 2d 1268, 1275-76 (Miss. 1991) (testimony that plaintiff was "very depressed ... [and] very upset over all this and emotional ... [and] not able to sleep," was insufficient to sustain an award of damages for mental anguish).

According to his response to the pending motion, Chamblee's claims for invasion of privacy and defamation are based on Knight's having disclosed the "false and unsupported" information regarding his termination to his former co-workers and to employees and groups of Farm Bureau members,[9] specifically by falsely representing to such persons that there was "ample evidence" to support the decision.[10]  Plaintiff arguably implies in his response memorandum that Farm Bureau, and Knight in

_____

[9]    Four theories are recognized for the tort of invasion of privacy:  "'(1) the intentional intrusion upon the solitude or seclusion of another; (2) the appropriation of another's identity for an unpermitted use, (3) the public disclosure of private facts, and (4) holding another to the public eye in a false light.'"  Brasel v. Hair Co., 976 So. 2d 390, 392 (Miss. Ct. App. 2008) (quoting Candebat v. Flanagan, 487 So. 2d 207, 209 (Miss. 1986)).  Plaintiff herein complains of the alleged public disclosure of private facts.

[10]    Plaintiff has asserted a claim for invasion of privacy based on allegations that defendants "secretly intercepted text communications from [him] to third parties without a legal basis to do so [and] monitored [his] private communications without a legal reason to do so."  Plaintiff has apparently now abandoned this claim.

23

particular, disclosed to Farm Bureau employees and members the
putative reason for his termination, i.e., his support of a
political candidate, yet no evidence has been presented to support
any such charge.  Clearly, word got around that Chamblee had been
terminated – or asked to resign – because he had allegedly
supported Middleton, but there is no evidence that Farm Bureau
disclosed to anyone other than members of the Executive Board the
reason for Chamblee's termination.[11]  Accordingly, plaintiff has no
cognizable claim for invasion of privacy.

---

[11]    In fact, plaintiff, who acknowledges that "[w]ord
travels fast in the world of Farm Bureau," has presented evidence
which suggests that it was widely *rumored* throughout the Farm
Bureau organization that he had been terminated for supporting a
political candidate.  A letter from Jasper County Farm Bureau
president John Keenan to Knight stated, "We have heard through
rumors that the reason for his termination was his support of a
specific individual for President."  Keenan asked for an
explanation, but Knight did not respond to his inquiry.
    Leake County Farm Bureau president Jimmie Arthur states in an
affidavit he was shocked when he was told Chamblee had been
politicking for Middleton and "could not believe that he was
terminated for that reason."  He does not suggest that he was told
this by Knight or anyone else in Farm Bureau management, however.
He goes on to state that he wrote to Knight, stating, "We know he
was given the option of resigning or being terminated with the
reason being given that he campaigned for another candidate" and
"have been told there is much evidence...."  Arthur demanded to be
provided "all the evidence" of Chamblee's involvement in the
campaign.  Knight responded to the letter, but declined to provide
any substantive information regarding Chamblee's termination.
    Dorothy Arthur states by affidavit only that she learned of
Chamblee's termination from a source outside the MFBF family; and
that when specifically questioned about Chamblee's termination at
a Leake County Farm Bureau annual meeting in September 2011,
Knight responded that MBMF had "ample evidence" to support the
termination decision.

Plaintiff's complaint for defamation appears to be based on his claim that in response to inquiries concerning Chamblee's termination, Knight falsely represented that there was "ample evidence" to support Farm Bureau's termination decision.  The statement that there was evidence supporting the termination was not false; and in the court's opinion, Knight's characterization of the evidence as "ample" cannot be "'reasonably understood as declaring or implying a provable assertion of fact.'"  Hudson v. Palmer, 977 So. 2d 369, 385 (Miss. Ct. App. 2007) (quoting Roussel v. Robbins, 688 So. 2d 714, 723 (Miss. 1996)).

Chamblee further asserts that Farm Bureau's response to his EEOC charge, in which it asserted that there was a "wealth of information" that Chamblee had supported a political candidate, was false and defamatory.  Farm Bureau submits its response to the EEOC was subject to qualified privilege, so that in the absence of proof of malice or a lack of good faith, which is lacking here, no defamation claim will lie.  See Stockstill v. Shell Oil Co., 3 F.3d 868, 872 (5th Cir. 1993) (qualified privilege applied to employer's alleged defamatory statements to EEOC relating to charge of discrimination, so that plaintiff could not prevail without proof of malice or lack of good faith).  The court agrees and concludes that summary judgment is in order on this claim.

Chamblee's state law claim for breach of contract and wrongful termination fails as a matter of law, since he was an at-

will employee who could be fired at any time.  See <u>Jones v. Fluor</u>
<u>Daniel Servs. Corp.</u>, 959 So. 2d 1044, 1046 (Miss. 2007) ("An
at-will employment contract may be terminated at any time, by
either party to the contract.").[12]  Plaintiff suggests that
certain training presented by Farm Bureau shortly prior to his
termination which recognized practices and procedures to be
followed by Farm Bureau prior to termination gave him the right
not to be terminated unless those procedures were followed.
However, the training described by plaintiff did not alter or
amend the employee handbook, which specifically apprised employees
as follows:

> Neither these rules, benefits and policies, nor any
> other written or oral statements are contracts of
> employment and both the employee and Mississippi Farm
> Bureau Federation understand that employment may be
> terminated by either party at any time, for any reason.

Plaintiff's claims for breach of contract and wrongful termination
will therefore be dismissed.

Based on all of the foregoing, the court concludes that
defendants' motion for summary judgment is well taken, and
accordingly, it is ordered that the motion is granted.

---

[12]   The Mississippi Supreme Court has recognized only two
narrow exceptions to the employment-at-will doctrine, permitting
an at-will employee to maintain a claim for wrongful discharge
where such employee is terminated because he has refused to
participate in an illegal activity or has reported an illegal
activity of the employee to the employer or to anyone else.  <u>Jones</u>
<u>v. Fluor Daniel Servs. Corp.</u>, 959 So. 2d 1044, 1046 (Miss. 2007).
Neither exception applies here.

A separate judgment will be entered in accordance with Rule 58 of the Federal Rules of Civil Procedure.

SO ORDERED this 22nd day of March, 2013.


/s/Tom S. Lee
UNITED STATES DISTRICT JUDGE